OPINION OF THE COURT
Mara T. Thorpe, J.
The petitioners herein seek to bring an infant, born on July-23, 1984, from Chile to New York for the purpose of adopting him under the laws of this State. They have filed an application pursuant to Domestic Relations Law § 115-a to obtain a preadoption certificate. Such a certificate is necessary for the petitioners to meet Federal immigration requirements for the child.
Upon review of the petitioners’ application as originally submitted, the court indicated in a decision dated November 27, 1984, that certain additional information and documents were required. (See, Domestic Relations Law § 115-a [4].) Upon being informally advised that some of the items specified in that decision could not be obtained from Chile, the court issued a supplemental decision on December 6, 1984, indicating what submissions it would accept in lieu thereof. Additional items were subsequently submitted, and it appears from the affidavits that no further information will be offered. Accordingly, the court proceeds to decide the application on the basis of the information now before it.
*613 It appears from the affidavits in support of the application that through the “Adoptive Parents Committee,” an organization of persons formed partially for the purpose of exchanging information regarding adoption procedures, the petitioners learned of one Mrs. Z., a woman residing in Pennsylvania who adopted a Chilean child in 1977 and through whom applications can now be made to adopt such children. The applications, which include a study by a social worker of the applicants and their home, are sent to Mrs. Z. who forwards them to her aunt in Chile. The affidavits disclose that dozens of Chilean children have been adopted in this country through Mrs. Z.’s aunt, who is identified as a social worker engaged in counseling mothers with regard to placement of their out-of-wedlock children and their own reentry into the job market. Such procedure was followed in this case, and it appears from the exhibits submitted that oh August 31, 1984, the petitioning prospective adoptive father issued three checks to Mrs. Z. totaling $10,000, all of which were certified and all of which are indorsed in the name of Mrs. Z. Thereafter, on September 27, 1984, the mother of the infant in question consented to release the child for emigration to the United States and adoption by the petitioners, and a Chilean court awarded the petitioners guardianship of the child.
The affidavit of the petitioners pertaining to the $10,000 paid lists the expenses as follows:
Foster care $1,500 Hospital and doctor expenses $3,500 Attorney’s fees for guardianship and legalization in Chile $1,800 Documentation passport fees, clothing, food, pediatrician, travel $2,000 Processing fee, travel prenatal care, social worker’s out-of-pocket expenses $1,200
In its prior decisions in this matter, the court indicated that it required a more detailed breakdown of these general categories of expenses and an indication of how the payments were made and to whom they were made in order to ascertain whether any payments contravened New York State public policy. As pointed out in the November 27 decision, Social Services Law § 374 (6) provides: “no person may or shall request, accept or receive any compensation or thing of value, directly or indirectly, in connection with the placing out or adoption of a child or for assisting a *614 parent, relative or guardian of a child in arranging for the placement of the child for the purpose of adoption; and no person may or shall pay or give to any person * * * any compensation or thing of value in connection with the placing out or adoption of a child or for assisting a parent, relative or guardian of a child in arranging for the placement of the child for the purpose of adoption.” Expenditures which are permissible under the statute, however, are payments “by a person with whom a child has been placed out of reasonable and actual medical fees or hospital charges for services rendered in connection with the birth of such child or of other necessary expenses incurred by the mother in connection with or as a result of her pregnancy or the birth of the child, or of reasonable and actual nursing, medical or hospital fees for the care of such child, if such payment is made to the physician, nurse or hospital who or which rendered the services or to the natural mother of the child” (Social Services Law § 374 [6]; emphasis added).
Although the supplemental materials submitted include an affidavit executed by Mrs. Z., the information provided therein sheds no additional light on the expenditures, some of which seem high even by New York City standards. Nor is any information provided about what, if any, efforts were made to obtain more detailed information and evidence that the recipients of the $10,000 are persons falling within the scope of Social Services Law § 374 (6). Indeed, although it appears that Mrs. Z. was sufficiently interested in assisting the petitioners in this matter to go to Nassau County to execute her affidavit, she has not supplied evidence that she actually forwarded the $10,000 to the people permitted by the statute to receive it, nor, for that matter, to anyone else. Most troubling of all, however, is the statement in Mrs. Z.’s affidavit that “[t]hese expenses vary from adoption to adoption, but the total remains fixed and has been established on the basis of the past experience of the people in Chile who process these adoptions.”
Given all of the foregoing, the court cannot conclude that the transactions underlying the instant application have not resulted in financial gain to one or more persons and do not violate this State’s strong public policy against “trafficking” in children. (Matter of Grand Jury Subpoenas [Morgenthau], 58 AD2d 1, 6; see, Governor’s Memorandum, NY Legis Ann, 1949, p 205; Barry E. v Ingraham, 43 NY2d 87, 94.) No claim has been made here that an “authorized agency” as defined by Social Services Law § 371 (10), which is permitted to charge reasonable and necessary expenses of a placement, participated in any of these arrangements, and as set out above, New York State policy *615 prohibits individuals from receiving or paying compensation either in connection with an adoption or for assisting a parent or guardian of a child in arranging for the placement of the child for the purpose of adoption. (Matter of Anonymous, 286 App Div 161, Iv denied 286 App Div 968; People v Michelman, 93 Misc 2d 297; see, People v Scopas, 11 NY2d 120, 126 [Burke, J., dissenting opn].) Even where placements are made by agencies authorized by Social Services Law § 371 (10) and § 374 (2) to do so, only those reasonable and necessary expenses of the placement may be charged (Social Services Law § 374 [6]), and if the sums expended do not cover specific and identifiable costs, or are not voluntary contributions to the agency, they are not permissible. (Matter of V., 91 Misc 2d 209.) As Judge Burke stated in People v Scopas (supra, at p 126), “[t]he evil is found in the business which may arise” from such transactions. “A trade in human beings was not intended to be permitted, and cannot be condoned, regardless of by how circuitous a route the practice is conducted” (p 126).
In enacting Domestic Relations Law § 115-a, the Legislature intended, in addition to satisfying Federal immigration requirements, to ensure that a child is not brought here from a foreign country only to have the adoption ultimately denied. (Matter of Pyung B., 83 Misc 2d 794.) Since courts have denied adoption petitions and ordered the removal of children from the prospective adoptive parents where aspects of the placement of the children in those homes were revealed to be contrary to public policy (see, Anonymous v Anonymous, 108 Misc 2d 1098; Matter of Anonymous, 46 Misc 2d 928), it is evident that a petition to adopt this child by these petitioners may well be denied by any court in New York State in which it is filed (see, Matter of Anonymous [G.], 89 Misc 2d 514). That this proposed adoption may have been arranged for humanitarian reasons shared by all is not a sufficient reason to give it judicial imprimatur. Maintenance of “the integrity of the adoptive process is paramount”. (Matter of Grand Jury Subpoenas [Morgenthau], supra, p 6.)
For all of the foregoing reasons, the court finds that it would not be in this child’s best interests to grant the application for a preadoption certificate, and accordingly it is denied.